# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

                                                     Case No.  10-32144

SHARON RENEE RACSKO

           Debtor

      DEAN B. FARMER, TRUSTEE

             Plaintiff

           v.                                  Adv. Proc. No.  11-3012

      SHARON RENEE RACSKO,
individually, and in her capacity as
Trustee of the Poppy Family Trust

           Defendant

## M E M O R A N D U M

**APPEARANCES:**   HODGES, DOUGHTY & CARSON, PLLC
                        Dean B. Farmer, Esq.
                        Alicia Cottrell, Esq.
                        Post Office Box 869
                        Knoxville, Tennessee  37901-0869
                        Attorneys for Plaintiff

                        POPE LAW FIRM
                        Rebecca M. Wright, Esq.
                        4 East Washington Avenue
                        Athens, Tennessee  37303
                        Attorneys for Defendant/Debtor

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint to Avoid Fraudulent Transfer and for Turnover of Estate Property (Complaint) filed by the Plaintiff on January 24, 2011, averring that the Debtor fraudulently transferred funds in the amount of $79,973.27 to the Poppy Family Trust 2008 of which she is the Trustee.  The Plaintiff seeks to avoid the transfer pursuant to 11 U.S.C. §§ 548(a) and 544(b)(1) (2006) in conjunction with Tennessee Code Annotated § 66-3-305 (2004).

The trial was held on August 17, 2011.  The record before the court consists of the Joint Filing of Stipulations for Trial (Joint Stipulations) filed by the parties on August 8, 2011, twelve exhibits introduced into evidence, and the testimony of three witnesses:  the Plaintiff, the Defendant, and William Watson.  The court also takes judicial notice, pursuant to Rule 201 of the Federal Rules of Evidence, of relevant documents of record in the Defendant's bankruptcy case containing facts stipulated by the parties.

This is a core proceeding.  28 U.S.C. § 157(b)(2)(H) (2006).

**I**

In connection with her divorce proceedings, the Defendant, pursuant to the Memorandum of Decision of the Superior Court of Connecticut, Judicial District of Waterbury, Regional Family Trial Docket entered on August 1, 2003, was awarded $100,000.00 from the retirement fund of her former husband, Richard Racsko, as a portion of the equitable distribution of the parties' assets. Jt. Stips. at ¶¶ 1-2; Trial Ex. 5.  The Defendant did not, however, receive her former husband's retirement funds until July 1, 2009. Jt. Stips. at ¶ 2.

2

On November 6, 2008, through a document entitled "Poppy Family Trust 2008" (Trust Document) the Defendant established the Poppy Family Trust 2008 (Poppy Family Trust or Trust) to receive and disburse funds for her minor children as beneficiaries of her father's, and their grandfather's, insurance policy. JT. STIPS. at ¶¶ 5-6; TRIAL EX. 6. The Trust Document designates the Defendant as Trustee of the Poppy Family Trust, granting her the right to change any beneficiary, amend any provision of the Trust, revoke the Trust in whole or in part, and withdraw any or all of the corpus, and also designates the Defendant's minor children as the sole beneficiaries of the Trust. JT. STIPS. at ¶¶ 9-10; TRIAL EX. 6 at ¶ III. It also expressly states that "Trustor will transfer and deliver to Trustee the property described in a warranty deed for real estate, to be recorded, all of which shall become part of the trust property, and this property along with any other later added property shall constitute the trust estate and shall be held and distributed by the Trustee as herein provided." TRIAL EX. 6 at ¶ I. As to distribution of the Trust estate, the Trust Document authorizes the Defendant to pay all taxes, maintenance, and insurance for the real property included within the Trust. TRIAL EX. 6 at ¶ IV. The Trust Document does not, however, expressly provide that the Poppy Family Trust was established to cover the children's educational expenses. JT. STIPS. at ¶ 8.

Following its creation on November 6, 2008, and pursuant to the Trust Document, the Defendant transferred into the Poppy Family Trust her ownership interest in residential real property located at 175 Country Way, Vonore, Tennessee (Residence), for $10.00 consideration, after which the Trust paid the majority of mortgage payments, which were the Defendant's individual obligation, until September 2010. JT. STIPS. at ¶ 11; TRIAL EX. 7; COLL. TRIAL EX. 19. The Defendant additionally opened a bank account with Citizens National Bank in the name of the Poppy Family

Trust 2008, and between December 15, 2008 and January 14, 2009, deposited a total of $66,542.96

received from the proceeds of her father's life insurance. JT. STIPS. at ¶ 7.  As of July 1, 2009, assets

of the Poppy Family Trust consisted of the Residence, where the Defendant and her children resided,

and a balance of $22,190.76 in the Citizens National Bank account.  JT. STIPS. at ¶¶ 12-13.  On

July 1, 2009, the Defendant received $99,976.59 from State Street Retiree Services for American

Airline Pilots Variable Plan, representing the portion of Mr. Racsko's retirement fund awarded her

in the divorce.  She deposited $79,973.27 of this award, representing the principal less taxes

withheld in the amount of $19,995.32, into the Poppy Family Trust.[1]  JT. STIPS. at ¶¶ 3-4; TRIAL

EX. 8.

On April 28, 2010, the Defendant filed the Voluntary Petition commencing her Chapter 7

bankruptcy case.  Her schedules, as amended on July 8, 2010, reflect assets with a value of

$22,869.34[2] and liabilities of $269,575.63, including $112,254.07 in unsecured debts.  JT. STIPS. at

¶ 14; COLL. TRIAL EX. 9.  On September 29, 2010, an Agreed Order for Turnover of Property to the

Estate was entered, wherein the Defendant, in her capacity as Trustee of the Poppy Family Trust,

---

[1] The court presumes that the $8.00 discrepancy in the amount of the deposit, $79,973.27, and the balance remaining after the taxes were deducted, $79,981.27, is the bank charge associated with the wire transfer.

[2] The court has made adjustments to accurately portray the status of the Debtor's assets as listed on her amended Schedules A and B filed on July 8, 2010.  In amended Schedule A, the Debtor listed real property with a value of $174,601.00.  Included within this amount is $167,100.00 attributable to the value of the Residence which is owned by the Poppy Family Trust and not the Debtor.  Thus, the true value of her scheduled real estate, a timeshare in Rhode Island, is $7,501.00.  In her amended Schedule B, the Debtor listed her personal property with a value of $365,368.34.  Of this amount, $350,000.00 is listed as the "current value" of her interest in three term life insurance policies on which the children are beneficiaries.  Clearly, a term life insurance policy has no "current value."  With the removal of these items, the scheduled value of the Debtor's personal property is $15,368.34.  Accordingly, the correct value of the Debtor's scheduled real and personal property is $22,869.34.

agreed, *inter alia*, not to make any transfers of the $71,317.36 balance held in the Poppy Family

Trust account as of that date.  JT. STIPS. at ¶¶ 15-16.

The Plaintiff filed the Complaint initiating this adversary proceeding on January 24, 2011.

Pursuant to the Amended Agreed Pretrial Order submitted by the parties and entered on August 1,

2011, the issues before the court, as defined by the parties, are as follows:

a.  Whether the Plaintiff/Trustee may avoid the transfer of funds that occurred on
July 1, 2009, from Defendant/Debtor to the Poppy Family Trust pursuant to 11
U.S.C. §548(a)(1)(A) where Plaintiff/Trustee avers the transfer was made with actual
intent to hinder, delay, or defraud entities to whom she was or became, on or after
July 1, 2009, indebted.

b.  Whether the Plaintiff/Trustee may avoid the transfer of funds that occurred on
July 1, 2009, from Defendant/Debtor to the Poppy Family Trust pursuant to 11
U.S.C. §548(a)(1)(B)(ii) and (iii)[3] where Plaintiff avers the transfer was fraudulent
because Defendant/Debtor received less than a reasonably equivalent value, if any,
in exchange for the transfer of funds into the trust.

c.  Whether the Plaintiff/Trustee may avoid the transfer of funds that occurred on
July 1, 2009, from Defendant/Debtor to the Poppy Family Trust pursuant to 11
U.S.C. §544(b) and Tenn. Code Ann. §66-3-305(a)(1) and (2) where Plaintiff/Trustee
avers the transfer was made with either actual or constructive fraudulent intent
pursuant to the factors outlined in Tenn. Code Ann. 66-3-305(b) and where the
transfer was made by Defendant/Debtor without receiving a reasonably equivalent
value, if any, in exchange for the transfer.  The parties stipulate, and will submit in
their pretrial stipulations, that Defendant/Debtor reasonably should have believed that
she would incur debts beyond her ability to pay as same became due at the time the
transfer was made.

d.  Whether the Plaintiff/Trustee may recover the value of property transferred on
July 1, 2009 from Defendant/Debtor to the Poppy Family Trust pursuant to 11 U.S.C.
550(a)(1) for any avoided transfer regarding the Poppy Family Trust.

f.  Whether the Defendant/Debtor should be compelled to turnover such funds to the
Plaintiff/Trustee pursuant to 11 U.S.C. §542(a) if the Court determines that the facts

---

[3] The Amended Agreed Pretrial Order omitted subsection e. and contains incorrect citations; the actual Code
sections are 11 U.S.C. § 548(a)(1)(B)(i) and (ii)(I) and (III).

and circumstances surrounding the transfer and Defendant/Debtor's use of the funds
subsequent thereto demonstrate that the funds were and remain Defendant/Debtor's
property and are, therefore, property of the estate pursuant to 11 U.S.C. 541(a)(2)(A).

PRETRIAL ORDER at 2.

## II

The Plaintiff initially seeks to avoid the Defendant's July 1, 2009 transfer into the Poppy
Family Trust of the $79,973.27 received from her former spouse's retirement under 11 U.S.C.
§ 548(a), which provides in material part:

> (a)(1)  The trustee may avoid any transfer . . . of an interest of the debtor in property,
> or any obligation . . . incurred by the debtor, that was made or incurred on or within
> 2 years before the date of the filing of the petition, if the debtor voluntarily or
> involuntarily—
>
>> (A) made such transfer or incurred such obligation with actual intent to
>> hinder, delay, or defraud any entity to which the debtor was or became, on or
>> after the date that such transfer was made or such obligation was incurred,
>> indebted; or
>>
>> (B)(i) received less than a reasonably equivalent value in exchange for such
>> transfer or obligation; and
>>
>> (ii)(I) was insolvent on the date that such transfer was made or such
>> obligation was incurred, or became insolvent as a result of such transfer or
>> obligation; [or]
>>
>> . . .
>>
>> (III) intended to incur, or believed that the debtor would incur, debts that
>> would be beyond the debtor's ability to pay as such debts matured[.]

11 U.S.C. § 548(a)(1). Actual or constructive fraud under either of the above referenced subsections
of § 548(a) requires proof by a preponderance of the evidence. *Slone v. Lassiter (In re Grove-*

6

*Merritt)*, 406 B.R. 778, 793 (Bankr. S.D. Ohio 2009); *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, 319 B.R. 134, 138 (Bankr. E.D. Ky. 2004), *aff'd*,196 Fed. Appx. 337, 341 (6th Cir. 2006).

## A

The Plaintiff first focuses on § 548(a)(1)(A), contending that the transfer should be set aside because it was made with the actual intent to hinder, delay, or defraud creditors.  Whether a transfer is fraudulent under § 548(a)(1)(A) depends on the specific facts and circumstances surrounding the transfer, and although fraudulent intent is rarely proved by direct evidence, it is often presumed through the presence of badges of fraud, which are facts throwing suspicion on the transaction that call for an explanation.  *Holcomb Health Care Servs., LLC v. Quart Ltd., LLC (In re Holcomb Health Care Servs., LLC)*, 329 B.R. 622, 670 (Bankr. M.D. Tenn. 2004) (citations omitted); *see also Schilling v. Heavrin (In re Triple S Rests., Inc.)*, 422 F.3d 405, 414 (6th Cir. 2005) ("Badges of fraud are circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them.") (citation omitted).  "Inadequacy of consideration, secret or hurried transactions not in the usual mode of doing business, and the use of dummies or fictitious parties are common examples of 'badges of fraud'[,]" *United States v. Leggett*, 292 F.2d 423, 426-27 (6th Cir. 1961) (citations omitted), as are "(1) a close relationship between the parties; (2) a transfer for no consideration; (3) the transferor's continued relationship with the property, for example, in the form of ongoing mortgage, tax and insurance payments on the property; and (4) each party's awareness of the transferor's increasing financial difficulty." *Children's Orchard, Inc. v. Children's Orchard Store No. 142, Inc*., 2010 WL 2232440, at *5 n.3 (E.D. Mich. May 28, 2010) (citing *United States v. Issac*, 1992 WL 159795, at *4 (6th Cir. July 10, 1992)).

"The presence of one or more of the badges of fraud gives rise to a presumption of fraud and consequently shifts the burden of disproving fraud to the defendant. . . . [Additionally,] the confluence of several badges can be conclusive evidence of fraudulent intent, absent significantly clear evidence of debtor's legitimate supervening purpose." *Holcomb Health Care Servs., LLC*, 329 B.R. at 671. Furthermore, if it is proved that a transfer was made with actual intent to defraud, "then 'the entirety of the transfer is avoidable' even if reasonably equivalent value is given in exchange." *Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distrib., Inc.)*, 446 B.R. 32, 63 (Bankr. E.D.N.Y. 2011) (quoting *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 629 (Bankr. S.D.N.Y. 2007)).

The Plaintiff asserts the presence of badges of fraud; namely, that the Defendant was in a precarious financial condition when she made the transfer to the Poppy Family Trust, that the transfer was given with inadequate consideration, that a family relationship existed between the Defendant, the Poppy Family Trust, and its beneficiaries, and that the Defendant retained exclusive control over the transferred property, shifting the burden of proof to the Defendant that she did not, in fact, possess the necessary intent. Based on the record, notwithstanding the presence of the foregoing badges of fraud, the Defendant has sufficiently disproved the presumption that the transfer was made with the actual intent to defraud or hinder creditors.

The Defendant testified that when she received her former spouse's retirement funds, she was in basically the same financial condition that she was in when she filed for bankruptcy, that she had the debts listed in her statements and schedules, many of which dated back to 2000 and the time of her divorce. As to why she did not use the funds to pay her creditors, the Defendant offered two

8

explanations, both of which the court finds credible and determinative of her intent.  With respect to the debts listed in her statements and schedules, the Defendant testified that, in an attempt to start over and clean up her credit, she signed up for a debt solution program in 2006 or 2007, to which she paid $39.00 per month for approximately a year.  It was her understanding that the accounts were then to be completely written off and removed from her credit report after seven years.  She testified that some things were, in fact, removed from her credit report, that her charged off accounts were 'non-debts' that she was no longer obligated for, and that it was only after discovering otherwise when she called to refinance her house, that she filed her bankruptcy case "to clean up the paper trail" as to the debts she had long ago thought were written off.  She also testified that she was paying her current bills when she received the retirement funds and transferred them into the Poppy Family Trust nine months before she filed her case.

With respect to her intended use of the retirement funds, the Defendant testified that she created the Poppy Family Trust with the intention that it would serve as a custodial account into which she would deposit funds to be used to support her children, believing that she had been ordered to establish an account by the Memorandum of Decision which directed that "[c]ustodial accounts maintained by the parties shall be applied to each child's college expenses." TRIAL EX. 5 at ¶ 21.  As is evident from the record and the Defendant's testimony, there is nothing suspect about the timing of the creation of the Trust in November 2008, around the time the Defendant's father passed away, and life insurance proceeds were to be left to the Defendant's children.  Upon the Trust's creation, and in fact, as referenced in the Trust Documents, the Defendant transferred her family's Residence via Warranty Deed dated November 6, 2008, and her father's life insurance

9

proceeds in the amount of $25,060.96 were deposited into the account in December 2008.  The fact

that the Defendant did not use the funds entirely for her children's educational expenses is irrelevant;

using the funds within the Trust to pay the mortgage where the Defendant and the children resided

constitutes use of the funds for support.

The Defendant also testified that it was her intention at all times to deposit her former

husband's retirement funds into the Trust whenever she received them.  This is further substantiated

by Collective Trial Exhibit 29, which consists of a number of letters between the Defendant and

American Airlines, reflecting her attempts to finally receive the funds awarded in 2003.  As reflected

in a letter to the Defendant from Donna Hicks, Pension Plan Administrator, the Defendant sent a

letter dated November 11, 2008 – three days after creating the Poppy Family Trust – seeking

information concerning when the funds would be received.  COLL. TRIAL EX. 29.  In two additional

letters, dated February 25, 2009 and April 29, 2009, respectively, the Defendant provided American

Airlines with the bank account information for the Poppy Family Trust, asking that the lump sum

distribution be made entirely into the account.  COLL. TRIAL EX. 29.  Unquestionably, the Defendant

had every intention from the time she created the Trust of depositing these funds therein to be used

for her family's support.

During her testimony, the Defendant acknowledged that although she interpreted it otherwise,

the Memorandum of Decision does not expressly require her to create a custodial account for deposit

of the retirement funds; however, she also testified that it had always been her intention that the

retirement funds would be used for her children to attend college since she would not have a way to

fund it otherwise.  When questioned as to the use of the funds, the Defendant agreed that, based on

10

the bank account records, the majority of the funds were not being used primarily for her children's education, with approximately $3,600.00 having been paid for her son's private school tuition. *See* COLL. TRIAL EX. 19. Instead, between December 2008 and September 2010, the Trust paid for a family trip to Israel, camp fees, approximately $20,000.00 for a car since her daughter was getting her learner's permit, approximately $12,000.00 for religious donations to Children of Zion, the Defendant's 501(c)(3) organization, and approximately $12,000.00 for the mortgage. Not all of the funds used for these purposes, however, were derived from the $79,973.27 transfer, and the court does not agree that these uses support the Plaintiff's assertions of actual fraud. The court likewise finds no issue with the facts that there was a close family relationship between the Defendant, the Poppy Family Trust, and the Trust's beneficiaries, that the Defendant did not receive anything from the Trust as consideration for the transfer, or that the Defendant maintained control over the funds following the transfer. The beneficiaries of the Trust are the Defendant's minor children, and it is not unreasonable that the Defendant would appoint herself as Trustee with the sole discretion to use the Trust corpus to support her family as she saw fit. The transfer of the $79,973.27 to the Poppy Family Trust is not avoidable under § 548(a)(1)(A).

### B

The Plaintiff also relies on the constructive fraud provisions of § 548(a)(1)(B) which, unlike subsection (A), does not carry an element of intent, and instead hinges on the value of the transfer and its effect on the Defendant's financial situation. *Holcomb Health Care Servs., LLC*, 329 B.R. at 672. As to this subsection, the issues the court is called upon to resolve are whether the Debtor received reasonably equivalent value for the transfer and whether she was insolvent or became

insolvent on the date of the transfer and/or believed that she would incur debts that would be beyond her ability to pay as such debts matured.  Because the Defendant stipulated that she should have believed that she would incur debts beyond her ability to pay as same became due at the time the transfer was made, JT. STIPS. at ¶ 18, the sole remaining constructive fraud issues are whether the Debtor received reasonably equivalent value for the transfer and was or became insolvent on the date of the transfer.

For the purposes of § 548, "value" is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor."  11 U.S.C. § 548(d)(2)(A) (2006).  The value of the property transferred is compared with the value of what the debtor received to ascertain whether there was a reasonably equivalent value; however, a dollar-for-dollar equivalent is not required. *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 707 (6th Cir. 1999); *Butler Aviation Int'l v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1125-26 (5th Cir. 1993).  Because considerations of valuation are inherently factual, courts must examine the case-specific circumstances surrounding the decision to enter into the challenged transaction.  *Lowe v. B.R.B. Enters., Ltd. (In re Calvillo)*, 263 B.R. 214, 220 (W.D. Tex. 2000).

"[R]easonably equivalent value is not an esoteric concept:  a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'"  *VFB, LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (quoting *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006)).  It is not limited "to money nor to value transferred pursuant to a valid contract[,]" *For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 560 F.3d 717, 722 (7th Cir. 2009),

12

and "fairly concrete" indirect benefits may also be considered. *Unencumbered Assets Trust v. Biomar Techs., Inc. (In re Nat'l Century Fin. Enters., Inc.)*, 341 B.R. 198, 215 (Bankr. S.D. Ohio 2006).

> [T]he proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors. As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.

> *Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 484 (4th Cir. 1992). "[I]t is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value." *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1125-26 (5th Cir. 1995).

*Congrove v. McDonald's Corp. (In re Congrove)*, 222 Fed. Appx. 450, 454, 2007 WL 130414, at *3, 2007 U.S. App. LEXIS 764, at *9-10 (6th Cir. Jan. 10, 2007). In essence, "[a] determination of reasonably equivalent value is 'fundamentally one of common sense, measured against market reality.'" *Lindquist v. JNG Corp. (In re Lindell)*, 334 B.R. 249, 256 (Bankr. D. Minn. 2005) (quoting *In re Northgate Computer Sys., Inc.*, 240 B.R. 328, 365 (Bankr. D. Minn. 1999)).

Notwithstanding the Defendant's lack of fraudulent intent, it is undisputed from the evidence that she was insolvent on July 1, 2009, when she transferred the $79,973.27 into the Poppy Family Trust account[4] and it is equally undisputed that she did not receive any consideration or value when she transferred the $79,973.27 into the Poppy Family Trust. At trial, the Defendant argued that her consideration for the transfer is that she lives in the Residence and that, up until September 2010,

---

[4] The Debtor's testimony that she was in basically the same financial condition when she received her former husband's retirement funds that she was in when she filed for bankruptcy on April 28, 2010, leads to the inescapable conclusion that she was insolvent on July 1, 2009. On both dates, her assets approximated $22,869.34, *see supra* n.2, while her liabilities approximated $269,575.63. *See* COLL. TRIAL EX. 9.

13

the Trust made payments on the mortgage. She also acknowledged, however, both at trial and in her June 9, 2011 deposition, that she received nothing from the Trust when she made the transfer. *See* TRIAL EX. 1 at p.138, ln.25 - p.139, ln.11. There was no lease executed, nor did the Trust enter into a contractual obligation with the Defendant to pay the mortgage for which she is personally obligated. This lack of reasonably equivalent value coupled with the Defendant's stipulation that at the time of the transfer, she should have believed she would incur debts beyond her ability to pay as they became due and the determination that the Defendant was insolvent at the time of the transfer, satisfy the elements of constructive fraud under § 548(a)(1)(B)(i) and (ii)(I) and (III). The transfer of $79,973.27 to the Poppy Family Trust on July 1, 2009, is avoidable.

## III

The Plaintiff also seeks to avoid the transfer to the Poppy Family Trust 2008 under 11 U.S.C. § 544(b), which allows the avoidance of the transfer of "an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b)(1). "Essentially, this provision permits the trustee to 'stand in the shoes' of an unsecured creditor and assert causes of action under state fraudulent conveyance laws for the benefit of all creditors." *Lyon v. Eiseman (In re Forbes)*, 372 B.R. 321, 330 (B.A.P. 6th Cir. 2007) (citations omitted). Under the umbrella of § 544(b), the Plaintiff seeks to avoid the $79,973.27 transfer through Tennessee Code Annotated § 66-3-305(a), which states the following:

14

> (a) A transfer[5] made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>>
>> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>>> . . .
>>>
>>> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TENN. CODE ANN. § 66-3-305(a).  The Plaintiff bears the burden of proof by a preponderance of the evidence, *Forbes*, 372 B.R. at 330, and "[w]hether a transfer is fraudulent is determined by the facts and circumstances of each case." *Macon Bank & Trust Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986); *see also Farinash v. Silvey (In re Silvey)*, 378 B.R. 186, 190-91 (Bankr. E.D. Tenn. 2007).  A debtor is statutorily presumed to be insolvent if "the sum of the debtor's debts [in existence when the transfer occurs] is greater than all of the debtor's assets, at a fair valuation" and the debtor "is generally not paying his or her debts as they become due." TENN. CODE ANN. § 66-3-303 (2004); *Crocker v. Ryan*, 914 S.W.2d 551, 553 (Tenn. Ct. App. 1995).[6]  As evidenced in the Defendant's amended Schedule F filed on July 8, 2010, she lists fourteen different unsecured creditors holding claims totaling $112,254.07.  *See* COLL. TRIAL EX. 9.

---

[5] "Transfer" means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance[.]" TENN. CODE ANN. § 66-3-302(12) (2004).

[6] A 'debt' is defined as "liability on a claim[,]" and 'claim' is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" TENN. CODE ANN. § 66-3-302(3), (5) (2004).

**A**

Because determinations of actual fraud are "inherently fact-laden, turning on the case-specific circumstances surrounding the debtor's decision to enter into the challenged transaction[,]" *Calvillo*, 263 B.R. at 220, as previously discussed, actual fraud may be discerned through the presence of "badges of fraud," which, for purposes of the Tennessee Uniform Fraudulent Transfer Act, are enumerated as follows:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all of the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TENN. CODE ANN. § 66-3-305(b) (2004); *see also Holcomb Health Care Servs., LLC*, 329 B.R. at

670-71 (citing badges of fraud recognized by Tennessee courts); *Brandenburg v. Hayes*, 2010 WL

2787854, at *3 n.4, 2010 Tenn. App. LEXIS 446, at *8 n.4 (Tenn. Ct. App. July 14, 2010) (same).

Having previously found that there was no actual fraud under § 548, for the same reasons, the court

likewise finds that there is no actual fraud under Tennessee Code Annotated § 66-3-305(a)(1).

**B**

With respect to whether the transfer is constructively fraudulent, the court must first

determine whether any value was received through the transfer and if so, whether it was reasonably

equivalent. Under the Tennessee Uniform Fraudulent Transfer Act:

> (a) Value is given for a transfer or an obligation if, in exchange for the transfer or
> obligation, property is transferred or an antecedent debt is secured or satisfied, but
> value does not include an unperformed promise made otherwise than in the ordinary
> course of the promisor's business to furnish support to the debtor or another person.
>
> . . . .
>
> (c) A transfer is made for present value if the exchange between the debtor and the
> transferee is intended by them to be contemporaneous and is in fact substantially
> contemporaneous.

TENN. CODE ANN. § 66-3-304 (2004). "In assessing whether a challenged transfer is supported by

reasonably equivalent value, courts generally compare the value of the property transferred with the

value of that received in exchange for the transfer." *Fordu*, 201 F.3d at 707. "'Reasonable

equivalence' does not require exact equality in value[,]" *Kendall v. Carbaat (In re Carbaat)*,

357 B.R. 553, 560 (Bankr. N.D. Cal. 2006), and "courts do not apply a mathematical formula but

consider the circumstances of the particular case." *Bigger v. Fields*, 2005 WL 2043762, at *3-4,

2005 Tenn. App. LEXIS 530, at *10-11 (Tenn. Ct. App. Aug. 25, 2005) (citations omitted); *see also*

*BFP v. Resolution Trust Corp.*, 114 S. Ct. 1757, 1762 n.4 (1994) (stating that "the phrase 'reasonably

equivalent value' means 'approximately equivalent' or 'roughly equivalent.'").   Once again, as

previously discussed, the Defendant received no value or consideration from the Poppy Family Trust

in exchange for the $79,973.27 deposit, and as stipulated, she should have believed that she would

have incurred debts beyond her ability to pay the same as they came due at the time the transfer was

made.  Accordingly, the July 1, 2009 transfer is also constructively fraudulent under Tennessee Code

Annotated § 66-3-305(a)(2)(B).


**IV**


Finally, the Plaintiff seeks recovery of the $79,973.27 under 11 U.S.C. § 550, which

provides, in material part, that "to the extent that a transfer is avoided under section 544 . . . [or]

548 . . ., the trustee may recover, for the benefit of the estate, the property transferred, or, if the court

so orders, the value of such property, from— (1) the initial transferee of such transfer or the entity

for whose benefit such transfer was made[.]"  11 U.S.C. § 550(a)(1).  "As is plain from its text,

section 550(a)(1) holds initial transferees strictly liable for any fraudulent transfers they receive."

*Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 532 (6th Cir. 2003).  Having found that the transfer

was constructively fraudulent under both § 548(a)(1)(B) and Tennessee Code Annotated

§ 66-3-305(a), the court finds that the Plaintiff is entitled to recover the entire $79,973.27 from the

Poppy Family Trust under § 550(a).  The court finds it unnecessary to address the § 542(a) issue set

forth at subsection f. of the August 1, 2011 Amended Agreed Pretrial Order.

A Judgment consistent with this Memorandum will be entered.


FILED:  September 14, 2011

BY THE COURT

*/s/  RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE